Nos. 25-8056; 26-2337

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

ELIZABETH MIRABELLI et al.,

*Plaintiffs-Appellees,*

v.

ROB BONTA, in his official capacity as Attorney General of California; et al.,

*Defendants-Appellants*,

On Appeal from the United States District Court for the Southern District of California
No. 3:23-cv-00768-BEN-VET
The Hon. Roger T. Benitez

# BRIEF OF LEGAL HISTORY AND FAMILY LAW SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF NEITHER PARTY

**Mary Ziegler**
Martin Luther King Jr. Professor of Law
UC DAVIS SCHOOL OF LAW
One Shields Avenue,
Davis, CA 95616
mziegler@ucdavis.edu

**Maxine Eichner**
Graham Kenan Distinguished Professor of Law
UNIVERSITY OF NORTH CAROLINA SCHOOL OF LAW
Van Hecke-Wettach Hall
160 Ridge Road, CB #3380
Chapel Hill, NC 27599
meichner@email.unc.edu

**Naomi R. Cahn**
Justice Anthony M. Kennedy Distinguished Professor of Law
Armistead M. Dobie Professor of Law
Co-Director, Family Law Center
UNIVERSITY OF VIRGINIA SCHOOL OF LAW
580 Massie Road
Charlottesville, VA 22903
ncahn@law.virginia.edu

**Angela Cai**
*Counsel of Record*
PLATKIN LLP
413 Washington Ave #174
Belleville, NJ 07109
973-561-1952
acai@platkinllp.com

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

INTEREST OF *AMICI CURIAE* ........ 1

SUMMARY OF ARGUMENT ........ 2

ARGUMENT ........ 4

I. History, Tradition, And Precedent Confirm That Parental Authority Is Not An End In Itself, But A Means of Protecting Children's Interests. ........ 4

A. Our Nation's History And Tradition Reveal That Child Wellbeing Is An Important Limitation On Parental Authority. ........ 5

B. Modern Supreme Court Caselaw Recognizes That Parental Authority Is Not An End In Itself, But A Right In Service Of Protecting Children's Wellbeing. ........ 14

II. This Court Should Take Care Not To Overstate The Extent And Reach Of Parental Rights. ........ 21

CONCLUSION ........ 25

APPENDIX ........ 27

CORPORATE DISCLOSURE STATEMENT ........ 32

CERTIFICATES ........ 33

## TABLE OF AUTHORITIES

**Cases**

*Bakker v. Welsh*, 108 N.W. 94 (Mich. 1906) .................................................. 14, 16
*Bonner v. Moran*, 126 F.2d 121 (D.C. Cir. 1941) ..................................................16
*Bosworth v. Beiller*, 2 La. Ann. 293 (La. 1847) ......................................................13
*Com. v. Murray*, 4 Binn. 487, 1812 WL 1190 (Pa. 1812)........................................10
*J.B. v. Washington Cnty.*, 127 F.3d 919 (10th Cir. 1997).........................................27
*Luka v. Lowrie*, 136 N.W. 1106 (Mich. 1912) .........................................................15
*Mahmoud v. Taylor*, 606 U.S. 522 (2025)...............................................................18
*Meyer v. Nebraska*, 262 U.S. 390 (1923)........................................................ 17, 18
*Mirabelli v. Bonta*, 146 S. Ct. 797 (2026)......................................................... 5, 28
*Mirabelli v. Olson*, No. 3:23-CV-768, 2025 WL 3713588
(S.D. Cal. Dec. 22, 2025) ...................................................................................25
*Moss v. Rishworth*, 222 S.W. 225 (Tex. Comm'n App. 1920) ......................... 15, 16
*Mueller v. Auker*, 700 F.3d 1180 (9th Cir. 2012) ............................................ 26, 27
*Parham v. J. R.*, 442 U.S. 584 (1979) ......................................................................18
*Parton v. Hervey*, 67 Mass. 119 (Mass. 1854)..........................................................13
*Pierce v. Society of Sisters*, 268 U.S. 510 (1925).....................................................18
*Prince v. Massachusetts*, 321 U.S. 158 (1944) ............................................... passim
*Quilloin v. Walcott*, 434 U.S. 246 (1978).................................................................18
*Santosky v. Kramer*, 455 U.S. 745 (1982)................................................................26
*Stanley v. Illinois*, 405 U.S. 645 (1972) ...................................................................18
*Thomason v. SCAN Volunteer Servs.*, Inc., 85 F.3d 1365 (8th Cir. 1996)................27
*Troxel v. Granville*, 530 U.S. 57 (2000)..................................................... 18, 23, 24
*Trump v. Boyle*, 145 S. Ct. 2653 (2025)...................................................................28
*United States v. Bainbridge*, 24 F. Cas. 946 (CC Mass. 1816)..................5, 9, 10, 11
*Washington v. Glucksberg*, 521 U.S. 702 (1997) ..................................................4, 7
*Wisconsin v. Yoder*, 406 U.S. 205 (1972)........................................... 18, 21, 22, 23

**Other Authorities**

2 James Kent, *Commentaries on American Law* (N.Y. O. Halsted 1827).........11, 12
Joel Prentiss Bishop, *Commentaries on the Law of Contracts upon a New and Condensed Method* (Chicago, T.H. Flood & Co. 1887).......................................11

Joel Prentiss Bishop, *Commentaries on the Law of Marriage and Divorce, and Evidence in Matrimonial Suits* (Boston, Little, Brown & Co. 1852)....................13
Michael Grossberg, *Governing the Hearth: Law and Family in Nineteenth Century America* (1988)....................................................................13
Nicholas Syrett, *American Child Bride: A History of Minors and Marriage in the United States* (2016)..........................................................................13
Rebecca Jo Plant & Francis M. Clarke, *No Minor Matter: Underage Soldiers, Parents, and the Nationalization of Habeas Corpus in Civil War America*, 35 L. & Hist. Rev. 881 (2017)..........................................................................11
Vivian Hamilton, *The Age of Marital Consent: Reconsidering Civil Recognition of Adolescent Marriage*, 92 B.U. L. Rev. 1817 (2012)....................12
William Blackstone, *Commentaries on the Laws of England* (Oxford 1765).......8, 9

**<u>Rules</u>**

Fed. R. App. P. 29............................................................................................ 3, 33

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are well-recognized scholars of legal history and family law who share an interest in providing this Court with accurate historical evidence and context for evaluating and applying constitutional law. *Amici* have published scholarly works on the historical grounding of parental rights and child wellbeing and leading family-law casebooks; they are also national experts who have participated in drafting the American Law Institute's Restatement of Children and the Law and the Uniform Law Commission on family law issues. A list of *amici* and additional background are included in the Appendix to this brief.

*Amici*'s focus in this brief is solely on the Court's approach to parental rights; they take no position on the ultimate outcome of the parties' dispute or the other legal issues raised in this case. *Amici* file this brief solely as individuals; institutional affiliations are listed for identification purposes only.

Thus, pursuant to Federal Rule of Appellate Procedure 29, *amici curiae* respectfully submit this brief in support of neither party. All parties have consented to the filing of this brief.[1]

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than *amici curiae* made a monetary contribution intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

## SUMMARY OF ARGUMENT

Our Nation's legal tradition has long recognized a general right of parents "to direct the education and upbringing of one's children." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). But equally foundational is the understanding that the parental right is not "beyond limitation." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). This case requires the Court to navigate both principles against a backdrop of difficult and contentious policy interests. Doing so requires a look back at the metes and bounds of the parental right as historically understood. *See Glucksberg*, 521 U.S. at 720.

History, tradition, and precedent confirm that parental rights are not equivalent to an individual's right to personal autonomy. Parental rights exist because they deeply influence the wellbeing of other persons: children. Our historical tradition has recognized that parental rights exist in order to promote the wellbeing of children and are mediated by the interests of the State and other stakeholders tasked with protecting child wellbeing.

First, judicial and authoritative historical sources confirm that the rights of parents were far from absolute. Rather, in several contexts ranging from enlisting in military service, marriage, and medical care, the historical record shows that minors in many instances had rights to make decisions for their own benefit without parental consent. In cases like *United States v. Bainbridge*, 24 F. Cas. 946 (CC Mass. 1816),

courts recognized the right of parents to custody and control of their children, on the one hand, and the rights of children to enter contractual obligations that benefit their wellbeing, on the other. Frequently, the parental right yielded to considerations of children's own autonomy, when doing so comported with children's wellbeing.

Second, Supreme Court jurisprudence confirms these limits on parental rights. In case after case, the Court has recognized that the upshot of asserting parental rights—and the source of their historical legitimacy—lies in the attendant impact on child wellbeing. In cases like *Prince*, 321 U.S. at 166-67, involving the state's role in protecting children, the Court recognized that assertions of parental authority—even when voluntarily heeded by the child—must yield to the state's interest in protecting child welfare in appropriate circumstances. Indeed, in its per curiam decision on the application to vacate the interlocutory stay order in this case, the Supreme Court confirmed, "Everyone agrees that children's safety is the overriding equity." *Mirabelli v. Bonta*, 146 S. Ct. 797, 803 (2026) (per curiam). In short, modern jurisprudence does not see parental rights either as absolute or as an end in itself.

Amici urge that the Court avoid painting the parental right with too broad a brush in its evaluation of this case. At key moments in this case thus far, the parties and trial court have focused primarily on parental authority. But as the historical evidence shows, our tradition has both recognized the importance of parental rights and limited those rights when parental authority undermines children's wellbeing.

Amici's submission is thus a modest one: that this Court consider those limitations, which are integral to the very core of the parental right to begin with. Consideration of whether parental rights serve child wellbeing in particular matters is neither practically unworkable nor foreign to our Nation's tradition; it is integral to the very purpose of parental rights. Courts have historically applied that inquiry in contexts like military service, marriage, and healthcare decisions of minors. In doing so, they have looked to the context behind both the parents' assertion of rights and the child's assertion of interest, including the age and maturity of the minor. This Court should do the same.

## ARGUMENT

### I. History, Tradition, And Precedent Confirm That Parental Authority Is Not An End In Itself, But A Means of Protecting Children's Interests.

The Fourteenth Amendment "protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). When evaluating whether a particular challenged rule or practice violates the Fourteenth Amendment, courts look to whether the conduct at issue is "so rooted in the traditions and conscience of our people as to be ranked as fundamental and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* (cleaned up).

A core aspect of this case is about the metes and bounds of the substantive due process rights of parents. It is therefore necessary to examine the Nation's history and tradition to understand the scope and texture of the asserted parental right. *See id.* As discussed below, nineteenth-century American legal authorities establish that parental authority was not seen as an end in itself, but rather as a means of protecting children's interests. That same principle is also reflected in twentieth-century Supreme Court precedents, which recognize that parental rights are not absolute, especially to the extent that the exercise of authority undermines the wellbeing of children.

### A. Our Nation's History And Tradition Reveal That Child Wellbeing Is An Important Limitation On Parental Authority.

Early American sources establish that parental authority was not absolute. These sources demonstrate a recognition of "minors' right to make certain decisions without their parents' approval if those decisions were believed to redound to minors' benefit." Naomi Cahn, Maxine Eichner & Mary Ziegler, *"For Their Benefit": The Lost History of Parental Consent And Minors' Rights*, 114 Calif. L. Rev. ____ (forthcoming 2026), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5156787, at 5 (hereinafter "For Their Benefit").

As Blackstone observed, the common law generally recognized the "*power* of parents over their children is derived from the former consideration, their duty"—that is, the attendant responsibilities of parents towards their children. William

Blackstone, *Commentaries on the Laws of England* 434, 440–41 (Oxford 1765). But common law authorities allowed minors to act for their own benefit in certain arenas. For example, Blackstone noted that minors could make certain contracts for their own benefit, especially in the case of "meat, drink, apparel, physic, and such other necessaries; and likewise for his good teaching and instruction." *Id.* at 454. And in the early days of our Republic, the assertion of parental rights was not the end of the inquiry in cases involving minor children entering into contracts without parental consent. Instead, case law established that minors could enter contracts when the underlying contract advanced the child's wellbeing. These contracts related to issues well beyond necessaries. These cases provide important foundational context for understanding the history and tradition behind parental rights.

For example, in *United States v. Bainbridge*, 24 F. Cas. 946 (CC Mass. 1816), Justice Joseph Story examined the issue of whether a minor could enlist in the Navy without his parent's consent. The case arose from the habeas petition from the father of Robert Treadwell, a twenty-year-old who had enlisted in the Navy and subsequently was convicted of desertion. At the time, the age of majority was twenty-one, making Treadwell a minor. Thus, his father argued, Treadwell's contract to join the Navy was void since there was no parental consent, and Treadwell's desertion conviction could not stand.

Disagreeing, Justice Story discussed the nature of parental rights with significant nuance. Although he recognized that fathers had the "right to the custody" of their children during infancy and that a father was "entitled to the benefit of his children's labor, while they live with him, and are maintained by him," Justice Story confirmed that parental authority over the child is limited in significant ways by considerations of the interests of the child. *Id.* at 949. For one, parental rights were bound by parental duty: "The custody of minors is given to their parents for their maintenance, protection, and education." *Id.* And should a parent assert authority "to answer his own mercenary views, or gratify his own unworthy passions, bind his child as an apprentice upon terms evidently injurious to his interests, or to a trade, or occupation, which would degrade him from the rank and character … entitle[d] him," and the like, such contracts would likely be invalid. *Id*. Moreover, absent statutory exclusions, minors could enter into contracts "for their benefit, and for the public benefit," even without parental consent. *Id.* at 951. Notably, at common law, if "the contract is for the benefit of the infant, as for instance, for necessaries, there it shall bind him; when it can pronounce it to be to his prejudice, it is void; and that where it is of an uncertain nature, as to benefit or prejudice, it is voidable only; and it is in the election of the infant to affirm it or not." *Id.* at 950. *Accord Com. v. Murray*, 4 Binn. 487, 1812 WL 1190, at *5 (Pa. 1812) (Yeates, J.) ("Where the minor has a

probable benefit at the time which may result from the contract, he shall not avoid it.”).

Thus, the court rejected the father’s argument that Treadwell’s enlistment contract without parental consent was void, noting that here, minors benefitted from such contracts: “The laws manifestly contemplate, that it is a personal contract made by the infants themselves for their own benefit.” *Bainbridge*, 24 F. Cas. at 951.

Common law authorities affirmed Story’s understanding of the law. Kent’s *Commentaries on American Law* affirmed that “when the court could pronounce [a] contract to the infant’s prejudice, it was void,” whereas a contract “to his benefit, as for necessaries, it was good.” 2 James Kent, *Commentaries on American Law* 195 (N.Y. O. Halsted 1827). Joel Prentiss Bishop’s canonical treatise on contracts, published later in the nineteenth century, reflected the enduring importance of this principle in our tradition: “the common rule” governing minors’ contracts was that “if it was clearly for the minor’s benefit, it is binding […]; if clearly to his disadvantage, it is void.” Joel Prentiss Bishop, *Commentaries on the Law of Contracts upon a New and Condensed Method* § 917, at 355 (Chicago, T.H. Flood & Co. 1887).[2]

---

[2] Cases involving the enlistment of minors created what the historians Rebecca Jo Plant and Francis M. Clarke called “endless confusion” in the decades before the Civil War. *No Minor Matter: Underage Soldiers, Parents, and the Nationalization of Habeas Corpus in Civil War America*, 35 L. & Hist. Rev. 881, 888 (2017). There

Concern for the benefit of minors and the broader society explained early courts and legal commentators' willingness to affirm marriage contracts entered by minors without parental consent.[3] Early influential treatises confirmed that for minors to marry, the "consent of parents, or guardians, to the marriage of minors is not requisite" in several states. 2 Kent, *Commentaries on American Law* at 73-74. For example, in states like Maine and Massachusetts, although statutes required magistrates and ministers to identify "consent of the parents or guardians" for minors under a certain age, the rule was a marriage without such consent "would nevertheless be lawful and binding, provided there was the presence and assent of a magistrate or minister." *Id.* at 77 (adding that Connecticut and New Jersey had similar policies deeming a marriage without parental consent as valid). Bishop's treatise on family law appeared to agree, noting that "The consent of parents is not, at common law, essential to the validity of the marriages of minors." Joel Prentiss Bishop, *Commentaries on the Law of Marriage and Divorce, and Evidence in Matrimonial Suits* § 174, at 136 (Boston, Little, Brown & Co. 1852). In keeping with

---

was no such confusion surrounding the centrality of minors' wellbeing for courts resolving such contracts.

[3] Although "[e]very state adopted the English age of legal majority" of 21, many states adopted a lower age of consent to marriage either by statute or by failing "to explicitly repudiate the English common law ages of presumptive marital consent – twelve for females and fourteen for males." Vivian Hamilton, The Age of Marital Consent: Reconsidering Civil Recognition of Adolescent Marriage, 92 B.U. L. REV. 1817, 1829–30 (2012).

the values of the time, these commentators assumed that marriage, like military service, could be beneficial both to minors and to the larger society. As the Massachusetts Supreme Judicial Court explained, marriage contracts could benefit minors by protecting them from "fraudulent marriages, seduction and illegitimacy." *Parton v. Hervey*, 67 Mass. 119, 121 (Mass. 1854).[4] In addition, the Court noted, such contracts support the "general interests of society . . . [through] guarding against the manifold evils which would result from illicit cohabitation" *Id.*

And while cases regarding minors and consent for medical treatment were rare before the twentieth century, *see* For Their Benefit at 9, cases in the early twentieth century sometimes rejected liability for medical providers when they provided necessary medical care to minor patients without parental consent. For example, in *Bakker v. Welsh*, 108 N.W. 94 (Mich. 1906), a seventeen-year-old boy

---

[4] Still other courts recognized that as a policy matter, parental rights *should* not be absolute but rather only exercised when it supports the best interests of the child. In *Bosworth v. Beiller*, 2 La. Ann. 293, 294–95 (La. 1847), the Louisiana Supreme Court observed, "The great and only just objects of a parent in marrying his children, are *to secure their happiness*, and to *advance the honor of his family*." (emphasis in original). And "[i]f the marriage of a minor secures its happiness, and does not dishonor the parent, it is unjust for the parent to withhold his consent." The court noted that "although marrying without the consent is cause of disinherison, it is not a just cause, in such a case." *Id*. As historian Nicholas Syrett has shown, "preserving marriage was seen as an intrinsic good, for husbands, wives, and their children." Nicholas Syrett, *American Child Bride: A History of Minors and Marriage in the United States* 108 (2016); *accord* Michael Grossberg, *Governing the Hearth: Law and Family in Nineteenth Century America* 69-75, 104 (1988).

named Stephen Bakker visited his aunt and sisters, and on that visit, went to a physician for surgery to remove a tumor. Stephen did not have parental consent for the operation. When he unexpectedly died on the operating table just prior to surgery, his father brought a tort claim against the physicians. The Michigan Supreme Court rejected the claim,[5] reasoning that it would be "too harsh a rule to say that under the circumstances disclosed by this record, . . . the defendants should be held liable because they did not obtain the consent of the father to the administration of the anaesthetic." *Id.* at 96. Relevant to its decision was the fact of Stephen's age—given that he was "almost grown to manhood," his prior experience with medical care, and the fact that he had consulted with other family members before consenting. *Id.*

The *Bakker* court's review of the context surrounding the minor's decision to obtain care without parental consent was important because it demonstrated that parental authority over matters as basic as a child undergoing surgery must still be viewed in full context. "In other words, the role of parental consent was a means of ensuring a positive outcome for the minor's health." *For Their Benefit*, at 10. Where a positive outcome would be impaired by requiring parental consent, by contrast,

[5] The court observed that the plaintiff had acknowledged that there was no known "decisions of a higher court either supporting or opposing the plaintiff's contention" that the physician could be held liable due to lack of parental consent. *Bakker*, 144 Mich. at 634. *Accord Bonner v. Moran*, 126 F.2d 121, 122 (D.C. Cir. 1941) ("In the great majority of the states, this question seems never to have arisen, nor are there any federal cases on the subject.").

parental consent would not be required. For example, in *Luka v. Lowrie*, 136 N.W. 1106 (Mich. 1912), the Michigan Supreme Court ruled against parents who sued over their fifteen-year-old son's amputation surgery without parental consent, and concluded that "[t]o hold that a surgeon must wait until perhaps he may be able to secure the consent of the parents before giving to the injured one the benefit of his skill and learning, to the end that life may be preserved, would, we believe, result in the loss of many lives which might otherwise be saved." *Id.* at 1110-11.

Importantly, cases in which courts found in favor of requiring parental consent in medical decision-making also ground the parental right in service of the best interests of the child. For example, in *Moss v. Rishworth*, 222 S.W. 225 (Tex. Comm'n App. 1920), the court found for the parents who sued over the medical operation of an eleven-year-old—without consent, and which resulted in death. It noted that the consent of the child's sister was insufficient to replace parental consent, and that attempting medical treatment "without the consent of the parent … would amount to a technical assault for the child." *Id.* at 226-27. Nonetheless, the Court linked the very concept of parental right to child wellbeing: "The law wisely reposes in the parent the care and custody of the minor child, and neither a physician nor those in temporary custody of the child will be permitted, in a case of this character, to determine those matters touching its welfare." *Id.* at 227. Further, the

Court noted, in the case at bar there was no contention "that any real danger would have resulted to the child" from the requirement of parental consent. *Id.* at 226.

Another example arose in *Bonner v. Moran*, 126 F.2d 121 (D.C. Cir. 1941), where the mother of a fifteen-year-old child sued medical providers after the son participated in medical interventions without parental consent to help a cousin who suffered from life-threatening burns. The D.C. Circuit noted that the general rule is that parental consent is needed for medical intervention of a minor, but listed exceptions for emergencies, emancipation, unavailability, and "where the child is close to maturity." *Id.* at 123 (citing *Bakker*, 144 Mich. 632). Importantly, the court recognized that "in all such cases the basic consideration is whether the proposed operation is for the benefit of the child and is done with a purpose of saving his life or limb." *Id*. And it closely examined the unusual circumstances at hand, noting that the Samaritan child was not the one who would benefit—the cousin would, and the surgery was "so involved in its technique as to require a mature mind to understand precisely what the donor was offering to give." *Id.*

In short, the historical development of parental rights in this Nation has a relatively consistent through line: parental rights were discussed and justified through the lens of child wellbeing, which required examination of the full context. Nineteenth-century courts thus did not require parental consent when the contract or decision at issue yielded consequences that redounded to the child's best interests.

### B. Modern Supreme Court Caselaw Recognizes That Parental Authority Is Not An End In Itself, But A Right In Service Of Protecting Children's Wellbeing.

In a line of cases going back a century, the Supreme Court has likewise repeatedly recognized that the substantive due process rights of parents are not absolute, but rather tempered by both state interests and children's interests in their wellbeing.

In the first landmark case recognizing that the substantive due process clause of the Fourteenth Amendment encompassed "the power of parents to control the education of their own," the Supreme Court in *Meyer v. Nebraska*, 262 U.S. 390, 403 (1923), discussed the right as one that must be balanced against state interests. It determined that in that particular case, the state interest in "foster[ing] a homogeneous people with American ideals prepared readily to understand current discussions of civic matters" did not win the day because "[n]o emergency has arisen which renders knowledge by a child of some language other than English so clearly harmful as to justify its inhibition with the consequent infringement of rights long freely enjoyed." *Id.* at 402-03. Thus, the challenged law lacked "reasonable relation to any end within the competency of the state." *Id.*

Importantly, the Court also provided context for scenarios in which state interests in protecting children can overcome assertions of parental authority. It noted that in the controversy before it, the teaching of children in modern foreign

languages "is not injurious to the health, morals or understanding of the ordinary child." *Id.* at 403. And it rejected the notion that the law could "protect the child's health by limiting his mental activities." *Id.* In discussing these limitations, the Court's implication was clear: while parents do have rights to control the education of their children, that right was bounded by considerations of the child's "health, morals, or understanding." *Id.* As the progenitor of a subsequent line of cases applying parental rights to a variety of contexts, *see, e.g.*, *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Prince v. Massachusetts*, 321 U.S. 158 (1944); *Stanley v. Illinois*, 405 U.S. 645 (1972); *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Parham v. J. R.*, 442 U.S. 584 (1979); *Troxel v. Granville*, 530 U.S. 57 (2000); *Mahmoud v. Taylor*, 606 U.S. 522, 567 (2025), *Meyer* solidified the notion that there are qualifications on parental rights, the metes and bounds of which would depend on the type of decision at issue and its relationship to children's wellbeing.

The Court performed that analysis in *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944), evaluating the parental right through the lens of child wellbeing and state assertion of children's interests. The Court considered the conviction of Sarah Prince, the aunt and legal guardian of a nine-year-old named Betty Simmons. Prince was prosecuted under Massachusetts laws for allowing Betty to distribute Jehovah's Witness literature on the street while Prince accompanied her. Section 69 of

Massachusetts's child labor law prohibited children under a certain age from selling newspapers and magazines in any street or public place. Further, state criminal statutes prohibited adults from furnishing children with items knowing they would be sold in violation of Section 69 and prohibited any parent or guardian from "permit[ting] such minor to work in violation" of Section 69. *Id.*

In ruling on Prince's parental rights challenge, the Court recognized that "custody, care and nurture of the child reside first in the parents," but emphasized that the "rights of parenthood" are not "beyond limitation." *Id.* at 166. Two particular considerations—child autonomy and child wellbeing—were central.

First, the Court began its discussion of parental rights by noting that the case concerned a situation where both the guardian and the minor's expressed preferences were aligned. It took care to note that excluded testimony at trial established that "Betty believed it was her religious duty to perform this work and failure would bring condemnation 'to everlasting destruction at Armageddon.'" *Id.* at 162-63. The Court then explained that both parents and children have "claimed liberties at stake": "One is the parent's, to bring up the child in the way he should go, which for appellant means to teach him the tenets and the practices of their faith. The other freedom is the child's, to observe these…." *Id.* at 164; *see also id*. at 165 (recognizing "[t]he rights of children to exercise their religion, and of parents to give them religious training and to encourage them in the practice of religious belief, as against

preponderant sentiment and assertion of state power voicing it.") Thus, the Court left open how far an assertion of parental rights can go if it conflicted with the child's assertion of autonomy.

Next, the Court delineated another constraint on parental rights: the State's interest in child wellbeing. It explained, "[a]cting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control." *Id.* at 166. "[T]he state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and that this includes, to some extent, matters of conscience and religious conviction." *Id.* at 167. Applying that framework of child wellbeing in this case, the Court came to two conclusions. For one, it observed that Prince's assertion of parental rights in this context posed no direct danger to Betty:

> The child's presence on the street, with her guardian, distributing or offering to distribute the magazines, it is urged, was in no way harmful to her, nor in any event more so than the presence of many other children at the same time and place, engaged in shopping and other activities not prohibited.

*Id.* For another, the Court recognized that the Massachusetts child labor laws were "to accomplish its legitimate objectives," and that there were "crippling effects of child employment, more especially in public places, and the possible harms arising from other activities subject to all the diverse influences of the street." *Id.* at 168 (citing empirical research). And the Court noted that "the parent's supervision may

reduce but cannot eliminate entirely the ill effects of the prohibited conduct." *Id.* at 170. Thus, it held that the convictions did not violate parental rights, as when it comes to "the power of the state to control the conduct of children," "the rightful boundary of its power has not been crossed in this case." *Id.*

In sum, despite recognizing parental authority as a right protected by the Fourteenth Amendment, and despite observing that this was a case where the child's assertion of religious liberty aligned with the parent's authority, the *Prince* Court nonetheless concluded that the State's interest in child wellbeing prevailed in the circumstances presented by that matter.

Moreover, in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the Court again grounded the parental right against the backdrop of children's wellbeing. In ruling for the plaintiffs—Amish parents who challenged Wisconsin's compulsory school attendance law on the grounds that attending high school was contrary to their religious beliefs—the Court again recognized that children's autonomy was a relevant factor, emphasizing that there was no indication of children's preferences or interests pointing a different way from the parents' in this case. *Id.* at 231 (finding no evidence that "respondents were preventing their children from attending school against their expressed desires, and indeed the record is to the contrary"). That is, as in *Prince*, the Court found it important that there was no evidence that the children's own interests in autonomy conflicted with their parents' wishes.

Next, the Court evaluated the exercise of parental authority against the limitation of child wellbeing. It explained, "the power of the parent, even when linked to a free exercise claim, may be subject to limitation under *Prince* if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Id.* at 233-34. Importantly, in reaching its conclusion that Wisconsin's compulsory attendance policy violated parental rights, the Court repeatedly emphasized the record evidence and that the evaluation of the strength of state interest would vary depending on the case. *Id.* at 234-35 ("Our disposition of this case, however, in no way alters our recognition of the obvious fact that courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education.").

Looking to the record, the Court noted that the State had an "admittedly strong interest in compulsory education." *Id.* at 236. But it pointed to the plaintiffs' "persuasive evidence undermining the arguments" that the State put forward that claimed child welfare interests, noting that that evidence showed that forgoing one or two "additional years of compulsory education will not impair the physical or mental health of the child, or result in an inability to be self-supporting or to discharge the duties and responsibilities of citizenship, or in any other way materially detract from the welfare of society." *Id.* at 234.

Moreover, in cases addressing the context of visitation rights, the Court reemphasized the importance of evaluations of the interplay between a parent's assertion of authority and the states' evaluation of child wellbeing. In *Troxel v. Granville*, 530 U.S. 57, 67 (2000), the Court considered a parental-rights challenge to a visitation order pursuant to a Washington law that permitted "[a]ny person" to "petition the court for visitation rights at any time" and gave the court power to grant such a petition when in its opinion "visitation may serve the best interest of the child." *Id.* at 66. Justice O'Connor, writing for a plurality of the Court, concluded that the particular order at issue granting visitation rights to the children's paternal grandparents was "an unconstitutional infringement on [Plaintiff] Granville's fundamental right to make decisions concerning the care, custody, and control of her two daughters" because the state court "failed to accord" Granville, the mother and "a fit custodial parent," "any material weight." *Id.* at 72. At bottom, "this case involves nothing more than a simple disagreement between the Washington Superior Court and Granville concerning her children's best interests." *Id.*

Ultimately, the Supreme Court plurality determined that the lower court must give some weight to the mother's decision regarding visitation, but did not require that her preferences receive overwhelming or decisive weight. Rather than, for example, impose a strong presumption in favor of the mother's decision, it simply determined that, in the context of visitation, the mother's decision be accorded "at

least some special weight." *Id*. at 70. Meanwhile, a majority of the Court declined to decide "[w]hether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation," noting only that "the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best 'elaborated with care.'" *Id.* at 73. In short, *Troxel* warns that the State's determinations on the child wellbeing inquiry cannot be wholly unbounded; but on the flipside, the assertion of parental rights cannot be unbounded, either.

As the above discussion shows, the Supreme Court's modern jurisprudence on parental rights recognizes the right as one with an inherently textured nature. The Court would consider the full context behind the assertion of the parental right, evaluating whether there was tension with the child's expression of her own autonomy or the child's wellbeing. As to the latter, in multiple cases, the Court recognized that the parental right derives its purpose and legitimacy through impacts on child wellbeing; thus, children's welfare is a natural limitation on the assertion of the right.

## II. This Court Should Take Care Not To Overstate The Extent And Reach Of Parental Rights.

In discussing parental rights in this case, both the district court and challenging parties discussed the right at a high level of generality. That discussion

lacked attention to and analysis of the historical tradition from which the right arose and what that tradition says about the contours of that right. Thus, Amici urge this Court to make clearer the historically-grounded boundaries and textured nature of parental rights.

For example, in reaching its conclusions on summary judgment, the District Court in this case observed, "The parental right is broad and encompasses both a right to direct a child's education and a duty to provide for a child's health care." *Mirabelli v. Olson*, No. 3:23-CV-768, 2025 WL 3713588, at *7 (S.D. Cal. Dec. 22, 2025). Although the Court correctly recognized that "the constitutional rights of parents are not unlimited or unbounded" and cited *Prince*, it did not devote requisite discussion to how those boundaries were historically understood or how they affected this case.

And thus far, Plaintiffs-Appellees have likewise characterized parental rights in blunt terms. For example, in their initial brief before this Court in response to the State's motion for stay pending appeal, Plaintiffs-Appellees emphasized "the law presumes fit parents act in the best interests of their children," adding that "[t]his presumption can be overcome only by an individualized judicial finding that the parents are not acting in their child's best interest, *Santosky v. Kramer*, 455 U.S. 745, 768-69 (1982), or '[i]n an emergency situation.' *Mueller v. Auker*, 700 F.3d 1180, 1187 (9th Cir. 2012)." Dkt. 11.1, at 20; *see also* D. Ct. Dkt. 247-1 at 14-20. But

courts historically have not viewed parental rights as limited by only those two specific exceptions. Instead, there are a variety of contexts in which the parental right must be balanced against competing rights and interests, chief among them child wellbeing. *See supra* Section I.

Moreover, Plaintiffs-Appellees appear to misunderstand the context in which the cases they cite arose. *Santosky* is a case about procedural due process, holding that the evidentiary standard of clear and convincing evidence applies to proceedings that would terminate parental rights entirely—a drastic action that implicates inquiries not directly applicable here. *See, e.g.*, *Santosky*, 455 U.S. at 762 ("[T]he factfinding stage of a state-initiated permanent neglect proceeding bears many of the indicia of a criminal trial."). Even so, the *Santosky* Court evaluated the standard of proof against "two state interests": "a parens patriae interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings," concluding that adopting a "standard of proof more strict than preponderance of the evidence is consistent with both interests." *Id.* at 766.

And the second case Plaintiffs-Appellees cite, *Mueller*, aptly illustrates the very limitations on parental rights that Amici describe here. That case concerned a scenario where, based on emergency medical personnel's best judgment, officers seized a five-month-old baby for a spinal tap against her parents' wishes. In holding

that the law was not clearly established to support the parents' civil rights claims, this Court confirmed that parental rights, "like all constitutional rights," are "not absolute." *Mueller*, 700 F.3d at 1186. The Court recognized that there is a longstanding doctrine that parental rights may at times "must bow to other countervailing interests and rights, such as the basic independent life and liberty rights of the child and of the State acting as *parens patriae*." *Id.* While *Mueller* concerned a drastic and emergency application, the principles underlying the need to balance those countervailing interests against parental rights are well-established. *See id.* (citing *J.B. v. Washington Cnty.*, 127 F.3d 919, 925, 927 (10th Cir. 1997); *Thomason v. SCAN Volunteer Servs., Inc.*, 85 F.3d 1365, 1371 (8th Cir. 1996)).[6]

Finally, although the Supreme Court in considering an emergency application in this matter discussed parental rights at a high level of generality, *see Mirabelli v. Bonta*, 146 S. Ct. 797, 803 (2026) (per curiam), this Court should not read the high court to be writing off nuances in longstanding doctrine in its short shadow docket order, *see Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (noting that "our interim orders are not conclusive as to the merits" although they do "inform how a court should exercise its equitable discretion in like cases"). The Court in this matter made

[6] As the *Mueller* court aptly observed, because "[s]ociety has seen fit to qualify parental rights in certain circumstances in favor of the life and liberty rights of a child[,] [w]hen the statutory due process used to actualize a child's right as recognized by state law comes into play, understandably parents will be upset." 700 F.3d at 1195-96.

a general statement that "parents—not the State—have primary authority with respect to 'the upbringing and education of children.'" *Mirabelli*, 146 S. Ct. at 803 (citations omitted). And while the Court noted that parents cannot be "be shut out of participation in decisions regarding their children's mental health," *id.*, the precise application of that general principle must depend on the type of decision at issue, as well as the factual circumstances presented. Moreover, the Court pointed out that "[e]veryone agrees that children's safety is the overriding equity." *Id*. That is precisely how such queries have been evaluated historically; this Court should do the same.

## CONCLUSION

For the foregoing reasons, Amici respectfully request that this Court consider the historical tradition behind the parental right and its limitations and make clear that such a right is neither absolute nor an end in itself but rather a means of achieving child wellbeing.

Dated: June 2, 2026

Respectfully submitted,

/s/ Angela Cai
Angela Cai
*Counsel of Record*
PLATKIN LLP
413 Washington Ave, # 174
Belleville, NJ 07109
973-561-1952
acai@platkinllp.com

Mary Ziegler
Martin Luther King Jr. Professor of Law
UC DAVIS SCHOOL OF LAW
One Shields Avenue,
Davis, CA 95616
mziegler@ucdavis.edu

Maxine Eichner
Graham Kenan Distinguished Professor of Law
UNIVERSITY OF NORTH CAROLINA
SCHOOL OF LAW
Van Hecke-Wettach Hall
160 Ridge Road, CB #3380
Chapel Hill, NC 27599
meichner@email.unc.edu

Naomi R. Cahn
Justice Anthony M. Kennedy Distinguished
Professor of Law
Armistead M. Dobie Professor of Law
Co-Director, Family Law Center
UNIVERSITY OF VIRGINIA SCHOOL OF LAW
580 Massie Road
Charlottesville, VA 22903
ncahn@law.virginia.edu

*Counsel for Amici Curiae*

# APPENDIX

**List of Amici Curiae**[7]

**Susan Frelich Appleton**
Lemma Barkeloo & Phoebe Couzins Professor of Law
Professor of Women, Gender, & Sexuality Studies (courtesy)
WASHINGTON UNIVERSITY IN ST. LOUIS

**Barbara A. Atwood**
Mary Anne Richey Professor of Law Emerita
Co-Director, Family and Juvenile Law Certificate Program
JAMES E. ROGERS COLLEGE OF LAW
THE UNIVERSITY OF ARIZONA

**Richard J. Bonnie**
Harrison Foundation Professor Emeritus of Law, Medicine, and Public Policy
Director Emeritus, Institute of Law, Psychiatry and Public Policy
UNIVERSITY OF VIRGINIA SCHOOL OF LAW

**Naomi R. Cahn**
Justice Anthony M. Kennedy Distinguished Professor of Law
Armistead M. Dobie Professor of Law
Co-Director, Family Law Center
UNIVERSITY OF VIRGINIA SCHOOL OF LAW

**June Carbone**
Robina Chair of Law, Science and Technology
UNIVERSITY OF MINNESOTA LAW SCHOOL

**Maxine Eichner**
Graham Kenan Distinguished Professor of Law
UNIVERSITY OF NORTH CAROLINA SCHOOL OF LAW

**Dov Fox**
Herzog Research Professor of Law
UNIVERSITY OF SAN DIEGO SCHOOL OF LAW

---

[7] Titles and affiliations are provided for identification purposes only.

**Cynthia Godsoe**
Associate Dean for Faculty Research and Scholarship
Dean's Research Scholar
Professor of Law
BROOKLYN LAW SCHOOL

**Leigh Goodmark**
Marjorie Cook Professor of Law
UNIVERSITY OF MARYLAND FRANCIS KING CAREY SCHOOL OF LAW

**Joanna L. Grossman**
Ellen K. Solender Endowed Chair in Women and the Law
Altshuler Distinguished Teaching Professor
SMU DEDMAN SCHOOL OF LAW

**Jennifer S. Hendricks**
Lindsley Memorial Professor of Law
UNIVERSITY OF COLORADO LAW SCHOOL

**Solangel Maldonado**
Eleanor Bontecou Professor of Law
SETON HALL UNIVERSITY SCHOOL OF LAW

**Serena Mayeri**
Arlin M. Adams Professor of Constitutional Law and Professor of History (courtesy)
UNIVERSITY OF PENNSYLVANIA CAREY LAW SCHOOL

**Linda C. McClain**
Robert Kent Professor of Law
BOSTON UNIVERSITY SCHOOL OF LAW

**Edward Stein**
Professor of Law
Director, Gertrud Mainzer Program in Family Law, Policy and Bioethics
CARDOZO SCHOOL OF LAW

**Gregg Strauss**
Joseph W. Dorn Research Professor of Law
UNIVERSITY OF VIRGINIA SCHOOL OF LAW

**Aaron Tang**
Professor of Law
UNIVERSITY OF CALIFORNIA, DAVIS

**Mary Ziegler**
Martin Luther King Jr. Professor of Law
UC DAVIS SCHOOL OF LAW

Three *amici* have co-authored three articles on the scope of parental rights. *See* Mary Ziegler, Maxine Eichner & Naomi Cahn, *Retrenchment by Diversion: The New Politics of Parental Rights*, 123 Mich. L. Rev. 669 (2025); Naomi Cahn, Maxine Eichner & Mary Ziegler, *"For Their Benefit": The Lost History of Parental Consent and Minors' Rights*, 114 Calif. L. Rev. ___ (forthcoming 2026); Maxine Eichner, Mary Ziegler & Naomi Cahn, *Opting Out: Mahmoud, Public Education, and the Future of Parental Rights*, __ Duke L.J. __ (forthcoming 2027).

Collectively, amici have authored the leading family-law casebooks in the country. *See, e.g.*, Susan Frelich Appleton, *Modern Family Law* (6th ed.) (with D. Kelly Weisberg); Naomi Cahn and Linda McClain, *Contemporary Family Law* (6th ed.) (with Douglas E. Abrams, Catherine J. Ross, Kaiponanea T. Matsumura, and Jessica Dixon Weaver); June Carbone, *Family Law* (7th ed.) (with Leslie Joan Harris

and Rachel Rebouche); Maxine Eichner, *Family Law: Cases, Texts, and Problems* (with I. Ellman, P. Kurtz, L. Weithorn, B. Bix, and K. Czapanskiy); Joanna Grossman and Douglas NeJaime, *Family Law in a Changing America* (with Ralph Richard Banks and Suzanne Kim).

Amici are also national experts who are active in the Uniform Law Commission on family law issues and were involved in drafting the American Law Institute's Restatement of Children and the Law.

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* certify that they are individuals for whom no corporate disclosure is required pursuant to Federal Rule of Appellate Procedure 26.1.

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2026, I electronically filed the foregoing Brief of Legal History and Family Law Scholars as Amici Curiae in Support of Neither Party with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: June 2, 2026

/s/ Angela Cai
Angela Cai
*Counsel for Amici Curiae*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-8056; 26-2337

I am the attorney or self-represented party.

**This brief contains** 6,786 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ______.
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Angela Cai **Date** 6/2/2026
*(use "s/[typed name]" to sign electronically-filed documents)*